UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEVEN JOSEPH REMBISH,

        Petitioner,

                               CASE NO. 2:17-cv-10600

v.

                               HONORABLE NANCY G. EDMUNDS

BONITA HOFFNER,

        Respondent.

_____/

## OPINION AND ORDER
## DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
## DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,
## AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Petitioner Steven Joseph Rembish has filed a *pro se* petition for the writ of

habeas corpus under 28 U.S.C. § 2254. The pleading challenges Petitioner's

convictions for first-degree murder, conspiracy to commit first-degree murder, and

several weapon charges. Petitioner alleges as grounds for relief that (1) there was

insufficient evidence at trial to support his convictions, (2) he was denied his right

to effective assistance of counsel on appeal, (3) his right not to be placed in double

jeopardy was violated by multiple counts rising from the same episode, and (4) he

was deprived of the presumption of innocence by being shackled during trial.

Respondent Bonita Hoffner argues through counsel that: the state court's ruling on

Petitioner's first claim was not an extreme malfunction; there was no violation of

double jeopardy jurisprudence; the shackling claim lacks merit; and the claim about appellate counsel fails because the two claims not raised on direct appeal lack merit. The Court agrees that Petitioner's claims do not warrant habeas relief. Accordingly, the petition will be denied.

## I. Background

Petitioner was charged with the following crimes in Saginaw County, Michigan: first-degree (premeditated) murder, Mich. Comp. Laws § 750.316(1)(a); conspiracy to commit first-degree murder, Mich. Comp. Laws §§ 750.157a and 750.316(1); discharge of a firearm at a dwelling or occupied structure, Mich. Comp. Laws § 750.234b; discharge of a firearm from a vehicle, Mich. Comp. Laws § 750.234a; carrying a weapon with unlawful intent, Mich. Comp. Laws § 750.226; felon in possession of a firearm, Mich. Comp. Laws § 750.224f; and six counts of possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.224b. The charges arose from the fatal shooting of Dawn Ricklefs at the Corner Lounge in Saginaw, Michigan on February 19, 2011.

Petitioner was tried jointly with his co-defendant, Roberto Rodea, in Saginaw County Circuit Court. The Michigan Court of Appeals accurately summarized the evidence at trial as follows:

> [A] number of witnesses testified that defendants Rembish and Rodea were involved in a fight at the Corner Lounge after they and others went to the location to celebrate a birthday. After the fight, the two were ejected from the bar. Witnesses heard Rodea stating that he had lost

some cocaine, and the witnesses testified that both he and Rembish threatened to return and "shoot up" or "spray" the bar. The two drove away in Rembish's car—a light blue 1986 Oldsmobile Calais—that Sean Rembish had purchased a week before. Witnesses then testified that, between 15 and 40 minutes after the fight ended, the Corner Lounge was struck by multiple bullets. Between 8 and 14 individuals were inside at the time, including Dawn Ricklefs. She was struck by two of the bullets, in the chest and in the shoulder, and died as a result of her injuries. Another patron was grazed in the head. A witness stated that, after the shooting, he went outside where he saw a car drive away from the bar with its headlights turned off. The car's taillights matched that of the photographs of Rembish's car. Still other witnesses testified that other shots were fired at approximately 1:15 a.m. at the Maple Gardens Bar, which was located near the Corner Lounge.

Sean Berg testified that he had a conversation with Rembish on Saturday, February 19, 2011. Rembish told Berg that he had just taken his car to "the farm" because he knew the police were looking for it. Rembish also told Berg that he had taken his gun out to the swamp and disposed of it.[1] Rembish told him that he planned to wait for the police to arrive and asked Berg to take care of Rembish's family. At approximately the same time, Berg received a call from Rodea, who told him that Rodea had "messed up," asked Berg to take care of Rodea's children, and stated that he was probably going away for the rest of his life. Rodea told Berg about the fight, that he had lost some cocaine at the bar, and that Rodea was "mad" and wanted to go back and get into a fight.

Rembish's girlfriend (Danielle Kuebler) testified that, prior to the shooting, Rembish had hidden a handgun, later matched to the type used in the shooting, in the fireplace of their home. Kuebler stated that at approximately 12:00 a.m., Rembish woke her up when he returned to the home. He came to the bedroom but, because she was mad at him for staying out late, she told him to leave. She then heard the fireplace open. She thought that Rembish remained out in the living room, but admitted that she did not know where Rembish was for approximately an hour to an hour and a half, when he eventually returned to the bedroom. Danielle Kuebler also testified that, after the police had

---

[1] Rembish's car was later located at the farm by police.

begun questioning others, she witnessed Rembish smash his cell phone in the driveway. He later wrote her a letter apologizing for putting her through stress, which she took to mean the stress of having her home searched. She was also questioned concerning whether Rembish had admitted that he had been involved in the shootings, and she stated that Rembish's story kept changing, but that he admitted involvement in the fight.

Detective Fink testified that he had analyzed the phone records of Berg, Rodea, and Rembish. Among the evidence presented was the finding that calls were made from Rembish and Rodea's phones in the vicinity of the Maple Gardens bar shortly after the 911 call reporting the shooting was placed. In addition to the phone evidence, witness testimony tied Rembish to a handgun model previously in his possession that had a very high probability of being the same model used in the shooting. Testimony placed the same car model as Rembish's at the scene of the Corner Lounge shooting.

 Motive for the crime . . . was shown in the loss, or theft, of Rodea's cocaine and in being ejected from the bar. And testimony that Rembish told Rodea after the fight, "if you don't get your stuff back everybody in this bar is going down, I mean everybody," provides evidence of a specific intent to return and harm people, and also provides evidence of the agreement necessary to support the conspiracy conviction. Similarly, witnesses heard Rodea directly exclaim that he planned to come back and spray the bar with bullets. Witnesses further stated that they believed he intended to make good on his threat. Contrary to Rodea's claim that he had no idea that the Maple Gardens bar even existed, phone records placed both his and Rembish's phones at the bar very shortly after the 911 call from the Maple Gardens shooting was made at 1:22 a.m.

*People v. Rembish*, No. 308916, 2015 WL 122703, at *9 –*10 (Mich. Ct. App. Jan. 8, 2015) (unpublished) (footnote in original as note 4).

The prosecutor's theory was that Petitioner probably was driving the car used in the shooting and that he either fired the gun or aided and abetted Rodeo in shooting

and killing the victim. Petitioner did not testify or present any witnesses. His defense was that there was no physical evidence, such as a weapon, DNA, fingerprints, or gunshot residue, linking him to the shooting, and that nobody had alleged he was the shooter. 1/11/12 Trial Tr. at 130-31, ECF No. 8-8, PageID. 571-72. He also maintained that Sean Berg was not credible and that there was insufficient evidence to convict him of aiding and abetting a homicide. *Id.* at 141-44, 150-51, Page ID. 574-577.

Rodea testified in his own defense. He admitted to being present at the Corner Lounge during the fight, but he claimed that he, Petitioner, Josh Kollman, and David Nietzelt left the bar after the fight and that he was at Petitioner's home, recovering from his intoxication, at the time of the shooting. Rodea acknowledged the witnesses' testimony about the threat he supposedly made at the Corner Lounge. He nevertheless claimed that he was drunk and angry at the time and that people say things they do not mean when they are drunk and angry. He also testified that, when he, Petitioner, Kollman, and Nietzelt left the Corner Lounge, Kollman was driving because Kollman was the only one who had a license. *Id*. at 39-56, 61-62, 69-71, 77-78, PageID. 549-554, 556-58.

On January 12, 2012, the jury found Petitioner guilty, as charged, of all twelve counts against him. On February 16, 2012, the trial court sentenced Petitioner to concurrent terms of: life imprisonment for the murder and conspiracy; four to eight

years in prison for the two counts of discharging a firearm; fifty-seven months to ten years for carrying a weapon with unlawful intent; and five to ten years for being a felon in possession of a firearm. The court also sentenced Petitioner to two years in prison for each of the six counts of possessing a firearm during the commission of a felony, with credit for 350 days. The trial court ordered the felony-firearm sentences to run concurrently with each other, but before the other sentences. 2/16/12 Sentence Tr. at 3-5, ECF No. 8-10, PageID. 636-638.

Petitioner appealed as of right, claiming that there was insufficient that he participated in the shooting and that, if the Court of Appeals disagreed, the evidence established second-degree murder, not first-degree, premeditated murder. The Michigan Court of Appeals rejected Petitioner's claim and affirmed his convictions in a *per curiam* opinion. *See Rembish*, 2015 WL 122703, at *9 - *10. Petitioner raised the same issue in the Michigan Supreme Court, which denied leave to appeal on March 3, 2015, because it was not persuaded to review the issue. *See People v. Rembish*, 497 Mich. 972; 859 N.W.2d 696 (2015).

In a subsequent motion for relief from judgment, Petitioner raised claims about his appellate counsel, the Double Jeopardy Clause, the admission of gruesome post-autopsy photographs, his shackling at trial, and the felony complaint. The state trial court denied the motion on the merits. *See* Op. and Order of the Court, *People*

*v. Remblish (sic),* No. 11-035679 FC 4 (Saginaw Cty. Cir. Ct. July 10, 2015), ECF No. 8-14, PageID. 872-874.

Petitioner appealed the trial court's decision without success. The Michigan Court of Appeals denied leave to appeal because Petitioner "failed to establish that the trial court erred in denying his motion for relief from judgment." *People v. Remblish*, No. 329957 (Mich. Ct. App. Feb. 24, 2016) (unpublished). The Michigan Supreme Court denied leave to appeal because Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Remblish*, 500 Mich. 896; 887 N.W.2d 191 (2016).

Finally, on February 23, 2017, Petitioner filed his habeas corpus petition. Included in the petition are a request for appointment of counsel and an evidentiary hearing. Pet., ECF No. 1, PageID. 10.

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). "[A] federal habeas court may not issue the

writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L.Ed. 2d 279 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. Thus, "[o]nly an 'objectively unreasonable' mistake, one 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,' slips through the needle's eye of § 2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir. 2019) (internal and end citations omitted), *cert. denied*, __S. Ct.__, No. 19-419, 2019 WL

5301304 (U.S. Oct. 21, 2019). A state-court's determination of factual issues, moreover, is presumed to be correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. Analysis

#### A. Sufficiency of the Evidence

Petitioner alleges that there was no evidence supporting the prosecution's theory that he participated in the shooting. He points out that no one identified him as the shooter or as a participant in the shooting. He also alleges that, even if he did participate in the shooting, the facts supported a verdict of second-degree murder, not first-degree, premeditated murder, because the prosecution failed to prove the specific intent to kill the victim.

The Michigan Court of Appeals adjudicated Petitioner's claim on direct appeal and found no merit in it. The Court of Appeals stated that the evidence was sufficient to prove the elements of first-degree murder, either as a principal or as an aider and abettor, and to show the agreement necessary for the conspiracy conviction. The Court of Appeals also stated that there was enough circumstantial evidence to show that Petitioner had at least joint control of the gun to support his felony-firearm convictions. *Rembish*, 2015 WL 122703, at *10.

### 1. Clearly Established Federal Law

The Supreme Court has held "that the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Following *Winship*, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted) (emphases in original). "Circumstantial evidence may support a conviction, and such evidence need not remove every reasonable hypothesis except that of guilt." *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006) (internal and end citations omitted).

Under AEDPA, moreover, a habeas court's "review of a state-court conviction for sufficiency of the evidence is very limited," *Thomas v. Stephenson*,

898 F.3d 693, 698 (6th Cir. 2018), because *Jackson* claims are "subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*). First, it is the jury's responsibility to decide what conclusions should be drawn from the evidence admitted at trial. *Johnson*, 566 U.S. at 651. And second, a federal habeas court may overturn a state court decision rejecting a sufficiency of the evidence challenge only if the state court decision was objectively unreasonable. *Id.*; *see also Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017) (stating that "two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the state appellate court"), *cert. denied*, 138 S. Ct. 1283 (2018).

### 2. Application

#### a. Identity

Petitioner asserts that there was insufficient evidence pointing to him as the shooter. "The identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003) (citing *People v. Turrell*, 25 Mich. App. 646; 181 N.W.2d 655, 656 (1970)). Nevertheless, "[i]f the evidence at trial was sufficient to permit jurors to find beyond a reasonable doubt that the man seated at the defense table was the same person referred to in the account of the offense, then there is no reason to overturn the jury's conviction based on the government's

alleged failure to prove identity." *United States v. Thomas*, 763 F.3d 689, 694 (7th Cir. 2014).

Here, there was sufficient evidence for the jury to find that Petitioner was the shooter or that he aided and abetted Rodea in shooting the victim. There was evidence that Rodea lost some cocaine during the fight at the Corner Lounge and that both he and Rodea threatened to return to the bar and spray it with bullets. *See, e.g.,* 1/5/12 Trial Tr. at 41-44, 48-49, 52, ECF No. 8-5, PageID. 295-98 (Lee Harvkey, Sr.'s testimony that, as he and others were trying to break up the fight, Rodea said that they were going to shoot the bar up if they did not get their drugs back); *id.* at 86-94, PageID. 306-08 (Craig Peterson's testimony that, after the fight, Petitioner asked Rodea whether he got his stuff back, and when Rodea said, "No, not yet," Petitioner said, "If you don't get your stuff back, everybody in this bar is going down, I mean everybody.").

Mr. Harvkey also testified that he saw a car leaving the Corner Lounge after the fight, and the tail-lights of the car were like the tail-lights on a photograph of Petitioner's car. *Id.* at 46-47, PageID. 296-97). Another witness identified Petitioner as the driver of the car. *See* 1/6/12 Trial Tr. at 12-29, ECF No. 8-6, PageID. 369-73.

Petitioner informed Sean Berg that he took his car to his uncle's farm because he knew the police were looking for it, and he took his gun to the swamp. *Id.* at 59-

60, 79, PageID. 380-81, 385. Petitioner also stated to Berg that he (Petitioner) was planning to sit back, drink a couple beers, and wait for the police to kick in his door. *Id*. at 60, PageID. 381. He asked Berg to take care of his (Petitioner's) family. *Id*. at 60, 79-80, PageID. 381, 385-86.

Petitioner's girlfriend, Danielle Kuebler, testified that, sometime between 12:00 a.m. and 1:00 a.m. on the night of the crime, Petitioner returned to their home and spoke with her in her bedroom. Because she was angry with him, she told him to leave. She thought that he subsequently went into the couple's living room because she heard the squeaky fireplace doors open, and that was where Petitioner had previously placed a gun which looked like the one used in the shooting. She claimed that she did not know whether Petitioner then left the house because she did not get out of bed, but she admitted that she did try to reach him by telephone after their argument. *Id*. at 170-87, 210-12, Page. ID 408-12, 418-19.

Detective Timothy Fink testified that Kuebler's phone call to Petitioner at 12:19 a.m. and 12:37 a.m. on February 19, 2011, went unanswered. The 911 call from the Corner Lodge was made at 12:52 a.m. that morning. *See* 1/10/12 Trial Tr. at 148-49, ECF No. 8-7, PageID. 487. An expert on firearms identification testified that all the casings and bullets in evidence appeared to have come from a Smith and Wesson nine-millimeter luger handgun, like the one that Sean Berg supposedly saw at Petitioner's home sometime before the shooting. *Id*. at 51-57, 61, PageID. 463-

65; *see also* 1/6/12 Trial Tr. at 60-63, ECF No. 8-6, PageID. 381(Berg's testimony about the gun).

The circumstantial evidence was sufficient to establish that Petitioner participated in the shooting. For the jury to have concluded otherwise, they would have had to believe that, by some random coincidence, someone else drove by the Corner Lounge after the fight and shot up the exterior of the building for no apparent reason. In the state prosecutor's words during closing arguments:

> What are the odds that these two men who made the threats to shoot up the bar, to commit murder, didn't follow through with it, and that some random person unassociated with whatever happened inside of that bar happened to have the same gun or type of gun that Steven Rembish had hidden inside of his fireplace and chose to use that firearm to shoot up the Corner Lounge?

(1/11/12 Trial Tr. at 104, ECF No. 8-8, PageID. 565.

A rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner participated in the shooting. At a minimum, the jury could have concluded that Petitioner drove past the Corner Lounge and thereby enabled Rodeo to shoot and kill the victim.

### b. Intent

Petitioner maintains that, even if his identity was established, there was no evidence of a specific intent to kill. To establish that Petitioner was guilty of first-degree, premeditated murder, the prosecutor had to prove that Petitioner "intentionally killed the victim and the act of killing was deliberate and

premeditated." *People v. Haywood*, 209 Mich. App. 217, 229; 530 N.W.2d 497, 503 (1995).

The Michigan Court of Appeals reasonably concluded that there was sufficient evidence to prove that Petitioner intentionally killed the victim. In reaching this conclusion, the Court of Appeals stated:

> Evidence that Rembish or Rodea fired several shots into the bar at a time when people were almost certain to be present was evidence of an intent to kill. Evidence that Rembish and Rodea had threatened the bar patrons with exactly what later occurred because Rodea could not find his cocaine, that Rembish went back to his home and retrieved the weapon, and that the pair then drove back to the bar, was evidence that defendants acted with premeditation and deliberation.

*Rembish*, 2015 WL 122703, at *10. This Court agrees and concludes that there was sufficient evidence of an intent to kill.

### 3. Conclusion on Petitioner's Sufficiency-of-the-Evidence Claim

The evidence at trial, taken in the light most favorable to the prosecution, established that Petitioner was involved in the fatal shooting at the Corner Lounge and that he had an intent to kill. Therefore, the evidence was sufficient to support his first-degree murder conviction, and the state court's adjudication of his claim was not contrary to, or an unreasonable application of, *Jackson*. Petitioner is not entitled to relief on his claim.

## B. Double Jeopardy

Petitioner alleges next that he is entitled to a new trial because he was convicted of, and punished for, multiple crimes arising from the same episode. He asserts that the multiple convictions and punishments violated his Fifth Amendment right not to be placed in double jeopardy.

The state trial court addressed Petitioner's claim during post-conviction proceedings and found no merit in it. The court noted that, under state law "a conviction for both the principal offense and felony-firearm is permissible," and "where multiple felonies are committed during a single transaction a defendant may be convicted of multiple counts of felony-firearm." *See* Op. and Order of the Court, at 2, *People v. Remblish (sic)*, No. 11-035679-FC 4 (Saginaw Cty. Cir. Ct. July 10, 2015), ECF No. 8-14, PageID. 873. The court also pointed out that, under state law, convictions for felony-firearm and intentionally discharging a firearm, felon in possession of a firearm, and carrying a dangerous weapon with unlawful intent have all been held proper. *Id*.

Respondent argues that the portion of Petitioner's double jeopardy claim relating to murder and conspiracy to commit murder is procedurally defaulted because he did not raise that sub-claim in his motion for relief from judgment, and he no longer has a remedy to exhaust. In the habeas context, a procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87,

89 (1997).  Ordinarily, a procedural default is not a jurisdictional matter, *Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016) (quoting *Trest*, 522 U.S. at 89), and a court may bypass a procedural-default question if the claim is easily resolvable against the habeas petitioner.  *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).

Petitioner's double jeopardy claim lacks merit.  Accordingly, the Court excuses the alleged procedural error and "cut[s] to the merits," as a procedural-default analysis would only complicate this case.  *Thomas v. Meko*, 915 F.3d 1071, 1074 (6th Cir.) (citing *Storey v. Vasbinder*, 657 F.3d 372, 380 (6th Cir. 2011)), *cert. denied*, 139 S. Ct. 2726 (2019).

### 1.  Clearly Established Federal Law

The Double Jeopardy Clause of the Fifth Amendment states that "[n]o person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb . . . ."  U.S. CONST. amend. V.   The Clause is "applicable to the States through the Fourteenth Amendment," *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988), "[a]nd it protects against multiple punishments for the same offense."  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled in part on other grounds by Alabama v. Smith,* 490 U.S. 794 (1989).   However, "[w]hat determines whether the constitutional prohibition against multiple punishments has been violated is the state legislature's intent concerning punishment."  *Jackson v. Smith*, 745 F.3d 206, 211

(6th Cir. 2014). In *Blockburger v. United States,* 284 U.S. 299 (1932), the Supreme Court

> created a test for determining whether two federal statutory provisions really proscribe the "same offense" and thus whether Congress presumptively intended just one punishment: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304, 52 S. Ct. 180. But this test, the Court has clarified, is merely a "rule of statutory construction," designed to assist courts in discerning Congress's intent; the Fifth (and Fourteenth) Amendments do not require the States to use it, and they are free to create their own tests, whether by statute or through judicial decisionmaking. Legislative intent is the touchstone; it, and not the *Blockburger* test, determines whether two offenses are the same and, if so, whether multiple punishments are nevertheless intended.

*Id*.

### 2. Application

In Michigan, first-degree murder and conspiracy to commit murder do not violate double jeopardy principles because the intent of the Michigan Legislature was to punish murder and conspiracy to commit murder as separate crimes. *People v. Burgess*, 153 Mich. App. 715, 731; 396 N.W.2d 814, 823 (1986). Thus, charging and punishing Petitioner with both first-degree murder and conspiracy to commit first-degree murder did not violate double-jeopardy principles.

State-court decisions indicate that the Michigan Legislature also intended to permit a defendant to be charged with both felony firearm and discharge of a firearm at a dwelling or occupied structure. *See People v. Guiles*, 199 Mich. App. 54, 59-

60; 500 N.W.2d 757, 760 (1993). The Michigan Court of Appeals implied in *Guiles* that the Michigan Legislature also intended to permit convictions for both felony-firearm and discharge of a firearm from a vehicle. *See id.*

Convictions for both felony firearm and carrying a dangerous weapon with unlawful intent have been upheld as well. *See People v. MacMillan*, 95 Mich. App. 292, 294-96; 290 N.W.2d 125, 126-27 (1980). And the Michigan Legislature "intended to permit a defendant charged with felon in possession to be properly charged with an additional felony-firearm count." *People v. Dillard*, 246 Mich. App. 163, 167–68; 631 N.W.2d 755, 758 (2001).

Furthermore, although Petitioner was convicted of, and punished for, six counts of felony-firearm, one for each of the other six felonies, the Michigan Supreme Court recognized in *People v. Morton*, 423 Mich. 650, 656; 377 N.W.2d 798, 801 (1985), that

> "the Legislature intended, with only a few narrow exceptions, that every felony committed by a person possessing a firearm result in a felony-firearm conviction." Indeed, the language of the statute leaves no doubt that the intent of the Legislature was to impose multiple convictions and cumulative punishment where a person possessing a firearm commits a felony by an act which is separate and apart from the act which gives rise to an excepted felony under the statute.

*People v. Sturgis*, 427 Mich. 392, 406-07; 397 N.W.2d 783, 789 (1986).

In conclusion, because the Michigan Legislature intended multiple punishments for Petitioner's crimes, the state trial court's rejection of Petitioner's

double jeopardy claim did not violate clearly established federal law.  Habeas relief is not warranted on Petitioner's claim.

## C.  Shackles

Petitioner alleges next that he is entitled to a new trial because he was visibly shackled in front of the jury during trial.  According to him, the shackling created the impression that he was a bad person and, more likely than not, guilty.  Petitioner also contends that the shackling deprived him of the presumption of innocence in violation of his constitutional rights to due process and a fair trial.  Finally, he claims that the shackles diminished his right to secure a meaningful defense because shackles can interfere with a defendant's ability to communicate with his attorney. The state trial court adjudicated and rejected Petitioner's claim during post-conviction proceedings.

The clearly established federal law on shackling is *Deck v. Missouri*, 544 U.S. 622 (2005), where the Supreme Court held

> that the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is "justified by an essential state interest"—such as the interest in courtroom security—specific to the defendant on trial.

*Id*. at 624 (citing *Holbrook v. Flynn,* 475 U.S. 560, 568–569 (1986), and *Illinois v. Allen,* 397 U.S. 337, 343–344 (1970)).

The record in this case, however, contains no reference to Petitioner being shackled at trial.  The facts, as alleged in the habeas petition, relate to Petitioner's

trial in a different case with similar convictions, but a different victim and a different incident (the fatal shooting of Sean Stennett on December 2, 2010).  *See* Pet., *Rembish v. Hoffner*, No. 2:17-cv-11120 (E.D. Mich. Apr. 10, 2017), ECF No. 1, PageID. 10, 31-33; *see also People v. Rembish*, No. 308738, 2015 WL 122703, at *1 - *2 (Mich. Ct. App. Jan. 8, 2015).

Although Petitioner alleged in the murder case involving Sean Stennett that he was also shackled at his trial for the fatal shooting of Dawn Ricklefs, the trial court stated on review of Petitioner's claim in the case involving Ms. Ricklefs that it was "well aware of its duty to take efforts to minimize the jurors' view of shackles or restraints."  Op. and Order of the Court, at 3, *People v. Remblish (sic)*, No. 11-035679 FC 4 (Saginaw Cty. Cir. Ct. July 10, 2015), ECF No. 8-14, PageID.874.  The court had "no memory of [Petitioner] being shackled (other than the taking of the verdict) during the trial or of any order or request that he be shackled."  *Id*.

Petitioner's conclusory allegations about being visibly shackled do not provide a basis for habeas relief, absent any evidentiary support.  *Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003).  Accordingly, the Court declines to grant relief on Petitioner's claim about shackles.

## D.  Appellate Counsel

Petitioner alleges that he was denied his constitutional right to effective assistance of counsel on direct appeal because his appellate attorney failed to raise

his double jeopardy and shackling claims on direct appeal. Petitioner maintains that the result of the appeal would have been different if appellate counsel had presented all his claims on direct appeal. Petitioner also contends that appellate counsel presented a "watered down" version of his first claim regarding the allegedly insufficient evidence at trial by not "federalizing" the claim.

The state trial court concluded during the post-conviction proceedings that there was no sound basis to support Petitioner's claim of ineffective assistance of appellate counsel. To prevail on his claim here, Petitioner must demonstrate (1) that his appellate attorney acted unreasonably in failing to discover and raise non-frivolous issues on appeal and (2) there is a reasonable probability he would have prevailed on appeal if his attorney had raised the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687-91, 694 (1984)).

Petitioner's double jeopardy and shackling claims lack merit for the reasons given above in the discussion of those claims. Therefore, appellate counsel did not act unreasonably in failing to discover and raise those claims, and there is no reasonable probability that Petitioner would have prevailed on direct appeal if counsel had raised the issues. "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

Petitioner's contention that appellate counsel "watered down" his sufficiency-of-the-evidence claim and failed to "federalize" the claim also lacks merit. Counsel cited the Fourteenth Amendment and *In re Winship*, 397 U.S. at 358, in his appellate brief. *See* Defendant-Appellant's Brief on Appeal*, People v. Rembish*, No. 308916 (Mich. Ct. App. Oct. 15, 2012), ECF No. 8-11, PageID. 677-79, 681, 689-90. Appellate counsel also correctly framed the constitutional issue as whether a rational trier of fact could find the essential elements of a crime were proved beyond a reasonable doubt. *See id.*, PageID. 689-90.

Appellate counsel's performance was not deficient. In addition, the alleged deficiency did not prejudice Petitioner's appeal because the Michigan Court of Appeals applied the correct legal standard and concluded after a thorough discussion of the issue that the evidence was sufficient to support Petitioner's convictions.

## IV. Conclusion

The state-court decisions in Petitioner's case were not contrary to, or unreasonable applications of, Supreme Court precedent. Their decisions also were not so lacking in justification that there was an error beyond any possibility for fairminded disagreement. The Court, therefore, denies the petition for writ of habeas corpus and Petitioner's request for appointment of counsel and an evidentiary hearing.

## V. Denial of a Certificate of Appealability

The Supreme Court has said that "a prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.

Reasonable jurists could not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. Accordingly, the Court denies a certificate of appealability. The Court nevertheless grants Petitioner permission to proceed *in forma pauperis* on appeal, because an appeal from the Court's decision could be taken in good faith. 28 U.S.C. § 1915(a)(3).

s/ Nancy G. Edmunds
NANCY G. EDMUNDS
Dated: January 6, 2020                    UNITED STATES DISTRICT JUDGE